**James Thomas BARRETT and wife et al., Plaintiffs,**

v.

**The CRAVEN COUNTY BOARD OF EDUCATION, as a Public Body Corporate of Craven County, North Carolina, et al., Defendants.**

Civ. No. 75–0043–CIV–4.

United States District Court, E. D. North Carolina, New Bern Division.

Jan. 7, 1976.

468

James V. Rowan, Paul, Keenan, Rowan & Galloway, Durham, N. C., for plaintiff.

David S. Henderson, Henderson, Baxter & Davidson, New Bern, N. C., for defendants.

## MEMORANDUM OF OPINION AND ORDER

LARKINS, Chief Judge.

From the pleadings, evidence, oral argument and memoranda submitted by the parties, the Court makes the following:

### FINDINGS OF FACT

This action was instituted by the plaintiffs on September 24, 1975, by the filing of a Complaint and issuance of Summons seeking to invoke the jurisdiction of the Court pursuant to 28 U.S.C.A. Sections 1343(3) & (4) and 42 U.S.C.A. Section 1983. The Complaint and Summons were served on the defendants on October 2, 1975. On October 21, 1975, the defendants' Answer, Counterclaim, and Motion for Summary Judgment, along with supporting Affidavits and documents, were filed and served on the plaintiffs. At the same time the plaintiffs were notified, formally and informally, that a hearing date of December 1, 1975, had been set by the Court for hearing defendants' Motion for Summary Judgment.

On November 3, 1975, counsel for the defendants agreed to an extension of time to November 26, 1975, within which plaintiffs had to respond to the Motion for Summary Judgment on the condition that it would not affect or otherwise disturb the December 1, 1975, hearing date. Nothing was filed by the plaintiffs within the period of the extension, but on Friday, November 28, 1975, one hundred seventeen (117) Interrogatories containing sub-parts and a Response to the Motion for Summary Judgment containing a request for an extension of time to delay the hearing were filed and served on the defendants. The Answers to the Interrogatories, a Reply to the Plaintiffs' Response, and a supporting Affidavit were prepared, filed and served on the plaintiffs on Sunday, November 30, 1975. On December 1, 1975, the Court heard oral presentation and argument on defendants' Motion for Summary Judgment and ordered each side to prepare briefs on the appropriateness of granting Summary Judgment on each of the issues raised by the plaintiffs' Complaint.[1] Those issues are:

1. Whether the construction of the Middle Grades School at the planned site will discriminate against the blacks and poor people.

2. Whether the electoral method by which the Craven County Board of Education was constituted at the time of the decision to locate the school was made, vitiates the action of the Board.

3. Whether federal funds are being expended in a discriminatory fashion.

4. Whether the Craven County Board of Education manifestly abused its discretion in locating the new school.

5. Whether the Craven County Board of Education violated the laws and Constitution of North Carolina by failing to select an architect for the new school by means of competitive bidding.[2]

---

1. Plaintiffs failed to file any such brief or further memoranda of law in opposition to defendants' Motion for Summary Judgment; defendants, within the required time, filed a 40 page memorandum of law, and a "Reply to plaintiffs Memorandum in opposition to Motion for Summary Judgment"

2. Issues 4 & 5 are alleged in plaintiffs' Complaint as being "pursuant to the Court's pendent jurisdiction of State claims."

6. Whether plaintiffs are guilty of such laches as should in equity bar the plaintiffs' action.[3]

During the School Year 1973–1974, the North Carolina Department of Public Instruction, School Planning Division, conducted a School Planning Survey of Craven County and recommended among other things, "that a new Middle School Grades 6–8 be provided for the West Craven Attendance Area," as a first priority. The Board of Education first began its consideration for the construction of such a new Middle Grades School at its meeting of January 31, 1974, when a motion was passed to proceed with the plans and construction of a new Middle Grades School in the western portion of the County. That same motion instructed the Superintendent to request a committee from the North Carolina Department of Public Instruction, Division of School Planning to visit Craven County and recommend a site for a new Middle Grades School. The Superintendent was also instructed to have Craven County School System personnel study other Middle Grades Schools and write Educational Specifications for the new school. The motion further called for the employment of Mr. Bobby Stephens with the firm of Stephens & Cardelli to be employed as architect for the planning and construction of the new school.

Pursuant to the Resolution and Directive by the Craven County Board of Education on January 31, 1974, to proceed with the plans and construction of a new Middle Grades School consisting of grades 6–8 for students in the western portion of Craven County, educational specifications and programs for the proposed school were prepared under the direction of Miss Ruth Hoyle, Assistant Superintendent for Instruction of the Craven County School System. Under her supervision, the principals of the various schools in the Craven County System with middle grades, a number of teachers and other school personnel worked for ap-proximately four months preparing the educational specifications for the proposed new Middle School. They worked with Mr. Bobby Stephens, Architect; they made numerous trips to various schools in North Carolina studying the physical plans and educational programs, including lunchroom arrangements, classes, rooms, science laboratories, libraries, etc. Sixteen (16) professional school personnel worked on the project. Upon completion of the work, it was submitted to the Department of Public Instruction, Division of School Planning.

This Department reviewed the work and approved part, rejected part and suggested revisions. These revisions were incorporated into the work and the same was revised accordingly and resubmitted to the Division of School Planning and was then approved by that agency. The work was codified in a bound volume titled "Educational Specifications, West Craven Middle School" and submitted to Mr. Bobby Stephens, Architect, who was directed to design the school to accommodate the educational specifications and programs therein indicated. Mr. Stephens and his staff worked on the design for the proposed school, conferring with the professional staff who prepared the educational specifications from time to time, at least monthly. The designs were periodically referred to the Division of School Planning for further review until the final plans and specifications were completed and resubmitted to the Division of School Planning for final approval.

A rather extensive search for suitable school sites in the western portion of Craven County was conducted for the most part by Mr. S. L. "Tom" Adams, one of the School Board members. At least six (6) sites were investigated but only three proved to be available for purchase. Those three (3) were submitted to the North Carolina Department of Public Instruction, Division of School Planning for evaluation as well as various other agencies of the State and County governments. All of these

3. The 6th issue, laches, is presented in the "Fourth Defense" of defendants' Answer.

agencies, including the Division of School Planning, North Carolina Department of Natural and Economic Resources, North Carolina Department of Transportation, U. S. Department of Agriculture, Soil Conservation Service, Craven County Department of Health, and the Craven County Planning Board, were unanimous in recommending the Hopewell site which was eventually acquired by the Board of Education on November 6, 1974. The money was appropriated for the purchase of that site by the Craven County Board of Commissioners at their meeting on September 16, 1974. The evidence further shows that during the months from January 1974, to the present, the Board of Education and its subordinates have given a considerable amount of thought, discussion and careful attention to the matter of the new Middle Grades School. The minutes of the School Board meetings and the numerous newspaper accounts of those meetings serve to illustrate the consideration and publicity which have gone into the school site decision both before and after its purchase. _ __ ___.

On March 13, 1975, at the request of two members of the Board and their constituents, a special public meeting was held to provide public airing of the grievances and objections of persons in western Craven County to be served by the new Middle Grades School. At the regular meeting of the Craven County Board of Education on March 27, 1975, a large delegation of citizens from the western portion of Craven County met with the Board to further express their views concerning the need for a change concerning the type of school and its location in the western portion of the County. After the matter was thoroughly discussed and all persons had had an opportunity to express their views, the Board voted to retain and continue with its present plans for the West Craven Middle Grades School and its location as previously agreed upon and approved. Considerable publicity was given both public hearings in advance by the local newspaper.

The area to be served by the new Middle Grades School is the western portion of Craven County lying west of Washington Forks and comprised of Townships 1, 3, 9, and portions of 8 and 2. It is roughly square in shape and covers an area of approximately four hundred (400) square miles. It is bisected laterally approximately midway by the Neuse River. The largest town in the area is Vanceboro which is located centrally north of the river and has a population of 758 people. The second largest town is Dover which is located in the extreme southwest corner of the area and has a population of 858 persons. Cove City is located centrally south of the river and has a population of 485 people. Only two bridges spanning Neuse River are located in this area. One is on the extreme western end of the county and the other is in the eastern portion of the area under consideration. The site selected for the new school is on the south bank of the Neuse River just west of the easternmost bridge and at the intersection of North Carolina State Roads Nos. 1423 and 1424.

The defendants have presented population and other statistical information compiled by the United States Bureau of Census and the information is compiled according to Census Enumeration Districts. These represent small geographic subdivisions of Craven County for which census information is compiled and analyzed. The area to be served by the Middle Grades School is comprised of Census Enumeration Districts One through Twelve (1–12) and portions of Numbers Thirty-two, Thirty-three, Thirty-four, Thirty-seven, and Thirty-eight (32, 33, 34, 37, and 38). Politically, the area under consideration is broken down into School Board Districts Numbers One, Three, and Six (1, 3, and 6).

In the past ten (10) years, School Board District Number One (1) (Vanceboro and all area north of Neuse River) has *decreased* 6.9% in population; School Board District Number Three (3) (Dover, Cove City, Fort Barnwell, and the westernmost portion of the County) has *decreased* 11.1% in population; however, School District Number Six (6) (Jasper, Tuscarora, Clarks, Washington

472

Forks, and the area in the immediate vicinity of the school site) has *increased* 5.4% in population.

Evidence from the census records further shows, for each Census Enumeration District, the total population, the white population, the black population, other population, per capita income, and average family income. A thorough study of these figures reveals that the total population as well as the black population is fairly uniformly distributed over the area to be served by the new school. It also appears that the statistics on per capita income and average family income are fairly uniform throughout the western portion of the County to be served by the new school.

The school will be located in Census Enumeration District Number Eleven (11), the population of which is 40% black and which has a per capita income of $1,489.00 and an average family income of $5,150.00. The school will be located very near to Census Enumeration Districts Numbers Twelve and Thirty-three (12 & 33); Number Twelve (12) is 58% black and has a per capita income of $1,445.00 and an average family income of $5,869.00; Number Thirty-three (33) is 65% black with a per capita income of $1,019.00 and an average family income of $4,727.00. In fact, if those Census Enumeration Districts in the immediate vicinity of the school site are combined, that is, Numbers Eleven, Twelve, and Thirty-three (11, 12, & 33), the population in the combined area is 51.5% black, the per capita income is $1,317.00 and the average family income is $5,248.00. These figures are lower than any other single Census Enumeration District in the western area. This information demonstrates that the present school site is located in a predominately black area which is also the poorest area in the western portion of the County. The black population in these three Census Enumeration Districts also represent 25% of the total black population for the area.

With regard to the racial balance in the new school and the resulting racial balance in the schools from which grades 6, 7, & 8 will be moved to the new school, three (3) existing schools will provide students for the new school, to wit: Jasper Elementary, Fort Barnwell Elementary, and Farm Life Elementary. The present racial balance in each of those schools and the racial balance after withdrawing students for the new school are as follows:

| SCHOOL | PRESENT BALANCE | | BALANCE AFTER CHANGE | |
|---|---|---|---|---|
| Jasper Elementary | Black | 60% | Black | 59% |
| | White | 40% | White | 41% |
| Fort Barnwell Elem. | Black | 61% | Black | 58% |
| | White | 39% | White | 42% |
| Farm Life Elementary | Black | 49% | Black | 51% |
| | White | 51% | White | 49% |

If the new Middle Grades School were placed in operation during 1976–77 School Year, the student population ratio would be Black 55%, White 45%. The student population of each existing school will be substantially reduced thereby relieving overcrowded conditions. The evidence further shows that 71% of the students who will attend the new school live within 9.8 miles of the new school site and 89.9% of the students live within 13.2 miles of the site.

The new Middle Grades School will be comprised of grades six, seven, and eight (6, 7, & 8) and will serve the entire western area of Craven County. It will be patterned after and substantially similar to the programs presently in operation at West Craven High School, Havelock High School, and Havelock Junior High School. It will conduct a full curriculum of studies and programs as required by the North Carolina Department of Public Instruction. It will also provide a wide variety of special education programs, extra-curricular activities, and athletic programs. All special education programs will be carried on during the normal school hours and will not require attendance by the participants outside those hours. No student will be deprived of adequate transportation because of his participation in any special education program since he will be able to ride the normal bus schedule. Club meetings or other special activities will be allotted time during regular school hours for such extra-curricular activities and no child would be deprived of transportation or participation by engaging

in these activities. Practices and competition for sports programs will be carried on in the afternoon immediately following normal school hours and not in the evenings. Transportation will be provided by activity bus to and from home for all participants in any of these extra-curricular athletic activities. This would include participants in related activities such as cheerleading. In addition to the buses providing transportation for all students to and from school during normal school hours, two (2) activity buses will be provided to serve only the Middle Grades School on a full time basis and they will be available to provide transportation to and from all school activities for which transportation is not otherwise provided. The services provided by the activity buses will be a substantial improvement on the present situation because those students who participate in sports or other extra-curricular activities at their present schools are not provided bus transportation to and from home for the purpose of such participation. In addition, the new school will provide an expanded sports program to include some sports activities which are not now available to the students at their present schools.

The proposed bus system serving the new Middle Grades School would require twelve (12) buses and the average student would ride 14.9 miles one way to school each day. No matter where the school is located, it will be nearer to some students than others and there will be some short bus routes and some long bus routes. The length of any bus route may be affected by the density or sparsity of the student population in the area it is assigned to cover.

The proposed bus routes show that Route # 1 extends into the northeasternmost corner of the area under consideration to the community known as Cayton and covers 30.9 miles one way. The average student on this route must travel 20.1 miles one way to the new school. This route crosses Neuse River on the easternmost bridge.

Proposed Route # 4 would serve the northwesternmost portion of the area under consideration and would travel 41.7 miles one way crossing the Neuse River at the easternmost bridge. An average student on Route # 4 would ride 12.1 miles one way to the new school.

Proposed Route # 6 would serve the Lane's Chapel area in the westernmost portion of the County and would travel 32.2 miles one way to the new school. An average student on this route would ride 20.1 miles one way to school.

Proposed Route # 7 would serve principally the Town of Dover and would travel 34.9 miles one way to the new school site. The average student on this route would ride 25.5 miles to school. However, since the bus is almost completely loaded while in Dover and the miles to the new school would be direct express travel, the time consumed in traveling should be considerably less than students on other routes.

A school site located south of Neuse River and further west toward Fort Barnwell would increase the total mileage for Route # 1, Route # 2, Route # 3, and Route # 4 because one must take into consideration the difficulty of crossing Neuse River.

With regard to funds expended by the defendants during 1974, $181,000.00 was expended for maintenance and capital improvements on schools in the western portion of the County, while only $31,500.00 was expended for similar purposes on other schools in the County System.

Defendants offered detailed accountings of all funds received and expended in the Craven County School System in recent years. State funds provide 70% of the total expenditures of the system and are expended on an equitable per student basis according to the number of students enrolled at each school. In addition, the State has allocated SEED funds to the Craven County School for improvement of instructional programs. All monies thus far received under this program have been expended in schools in the Western Craven County area.

Local funds constitute approximately 10% of the money spent in the Craven County Schools and this money is also required to

be and has been spent on an equitable per student basis.

Federal funds constitute approximately 20% of the total budget for the Craven County Schools and are spent according to the directives and guidelines established by the United States Department of Health, Education and Welfare. In fact, for the School Years 1970–71 through 1974–75, 61% of all federal funds received by defendants have been expended in western area schools. During those same years, western area students have received $575.41 per capita in funds while all other students in the Craven County School System during the same period received $237.15 per capita. This represents an expenditure of 240% more of the federal funds per student in the western area than in the remainder of the school system. Certain federal funds are also provided by the National Defense Education Act for the purchase of instructional supplies. The audit of these funds placed in evidence by the defendants shows that during the School Years 1970–71 through 1974–75, students in the western portion of Craven County received $16.57 per capita of these funds while all other students in the Craven County School System were receiving $10.96 per capita of the same funds. Consequently students in the western area received 151% more NDEA funds per capita than all other students in the school system.

Plaintiffs' Complaint alleges that at the time the new Middle Grades School site was selected, one member of the Craven County Board of Education was selected solely by voters residing within the City Limits of New Bern, North Carolina. Plaintiffs further state that voters and their children residing within the New Bern City Limits do not attend or utilize Craven County Schools.

Under the election scheme enacted by the North Carolina Legislature and in effect for Craven County Board of Education at the time in question, no member of the Craven County Board of Education was elected solely by voters residing within the City Limits of New Bern, North Carolina.[4] The Board member to whom the plaintiffs' Complaint apparently refers is Mr. J. Macon Miller who occupies the seat representing the New Bern City School District.[5] The New Bern City School District is made up of the City of New Bern and approximately one-half (½) of Number Eight (8) Township lying outside the city limits of New Bern.[6] Under the election scheme in effect at that time, Mr. Miller was nominated by members of his political party residing within the New Bern City School District to represent his party in the general election as a candidate for the Craven County School Board seat representing that district. In the general election, he ran against a candidate of the opposing party and was elected at large by all voters in Craven County as were all other members of the Craven County Board of Education.[7] In fact, in the 1974 general election, those precincts in which the plaintiffs reside gave a substantial majority of votes to Mr. Miller and contributed to his victory in the county wide election.[8]

Certain cooperative activities and functions are carried on between the Craven

4. Chapter 887, Session Laws of N.C. Legislature, 1967, ratified 22, June, 1967. Sec. 3 provides: "In the County Election of 1968, and biennially thereafter, there shall be elected, by the qualified voters of the entire County, members of the Craven County Board of Education to take the place of the members whose terms next expire. The candidate receiving the highest number of votes cast for candidates in his district shall be elected for the term specified in Section 2 of this Act and until his successor is elected and qualified.

5. Sec. 1, Chapter 887, Session Laws, 1967, provides, inter alia, that School District No. 8,

consists of the 1st, 2nd, 3rd, 4th, Tisdale, Bern and Rhems precincts. J. Macon Miller was elected to this seat on the School Board in the November, 1974 General Election and took office in December, 1974.

6. Chapter 887, Session Laws of 1967, *supra*.

7. Chapter 887, Session Laws of 1967, *supra*.

8. In the 1974 General Election, J. Macon Miller carried all 23 precincts in the County by a substantial majority according to the 1974 official tabulations of the Craven County Board of Elections.

County Board of Education and the New Bern City Schools. In addition, the citizens and residents of the New Bern City School District are taxpayers whose taxes are used in part to support the Craven County School System.

On May 26, 1975, the General Assembly of North Carolina enacted a new statutory scheme for the election and terms of office of the Craven County Board of Education and realigned the districts for the Board.[9] This new scheme eliminates the seat on the Board representing the New Bern City School District. Therefore, under the terms of that statute, Mr. Miller shall continue to hold office until his term expires, at which time his seat will be eliminated.[10]

On June 25, 1975, the General Assembly of North Carolina amended N.C.G.S. Section 115–18 relative to the method of electing members of County Boards of Education.[11] That amendment provides in substance that no voter residing within the New Bern City School District shall be eligible to vote for members of the Craven County Board of Education. It also provides all school board members now serving shall continue to serve until their terms expire.

The Craven County Board of Education began its efforts to locate and build a new Middle Grades School in the western area of the County in January of 1974. The site selection process was carried on publicly from January 1974 through September 1974 when the decision was made to purchase the present site. One of the plaintiffs, Mr. William Pappas, was present when the money for the purchase of the present site was appropriated by the Craven County Board of Commissioners on September 16, 1974, and voiced his objections to that body at that time. After the elections in 1974,

the new Board agreed to reconsider its decision on the present site and held a special meeting for a public hearing on the matter on March 13, 1975. Some of the plaintiffs and members of the class they purport to represent were present and stated their objections and contentions. The Board received another delegation at its next regular meeting on March 27, 1975, and again listened to their position. Considerable publicity was given in advance of and after both said meetings in the local newspaper. After full and deliberate consideration, the Board voted once again to continue with plans to construct the new Middle Grades School at the present location. A considerable amount of time, effort, and money have been expended in locating, testing, and acquiring the present site.[12] In addition, a considerable amount of time and money has been spent by architects and engineers in the planning and design of the school plant.[13] All decisions and actions by the School Board on the new Middle Grades School have been given wide and thorough publicity by the local newspaper and all have been done with the knowledge of the plaintiffs themselves and their duly elected representatives. In addition to the time and funds already expended, at the time of the institution of this action, the defendants were prepared to advertise invitations to contractors to bid for the construction of the new school. Should the same school be re-located on a different site, the estimated additional cost of required engineering and re-design work would be $20,500.00.

Furthermore, the new Middle Grades School will have numerous advantages and offer substantially better educational opportunities. The newly constructed modern school facility will have central heat and air-conditioning providing a more comfortable atmosphere in which to study and learn.

9. Chapter 376, Session Laws 1975, of N. C. Legislature.

10. Sec. 2, Sec. 3, Chapter 376, 1975 Session Laws, *supra*.

11. North Carolina General Statutes, Chapter 115, Sec. 18, as amended by Chapter 855, Sessions Laws of N. C. Legislature, 1975.

12. Site purchase, legal engineering, and improvement have cost a total of $78,268.31.

13. Defendants have incurred a cost of $92,-000.00 thus far in architectural and engineering fees.

It will eliminate overcrowded conditions existing in the present schools as well as the necessity for the use of mobile trailer units for classrooms. It will have a larger area for physical education and sports than presently exist at any of the feeder schools and will also have an increased sports program. The design provides units which allow for team-teaching and individualized instruction which is not available at any of the present schools. It will provide for larger, expanded, and improved areas for science laboratories; gymnasium for physical education and sports; library; occupational education for business education, home economics, and industrial arts; special education areas for the mentally retarded, hard of hearing, poor vision and some homebound students; lunchroom with a capacity to serve two different meals each day (lunch and breakfast); a large commons area; larger playground area; individualized instruction areas for more comprehensive program in reading; movable classroom walls to provide for larger or smaller instructional areas; esthetic design to promote in the students a sense of the artistic and esthetic value; and space for a full time band instructor for musical education as well as a full time school band.

Plaintiffs filed no response to defendants' Motion for Summary Judgment and supporting affidavits and documents except a motion for enlargement of time. Two (2) days after the time to respond, as enlarged, had expired on November 28, 1975, and two (2) days before oral argument, plaintiffs filed thirty (30) affidavits, one hundred seventeen (117) interrogatories, and a "Response to Defendants' 56B Motion for Summary Judgment" and a "Memorandum in Opposition to the Motion for Summary Judgment."

Three (3) of the affiants in said affidavits are parties plaintiff; the rest are not. Eighteen (18) affidavits are identical and recite, in substance, that the affiants reside in western Craven County and opine that the proposed location of the new school will work a hardship on affiant and will harm others who live near affiant; and that the greatest hardship will be worked upon poor and blacks who live on farms; and that the poor and black of western Craven County will be unable to attend school activities; and, therefore, will be penalized for being poor and living in western Craven County.

Ten (10) affidavits recite in substance that the affiants believe that the distance to be traveled to the new school will work a hardship on the students and cause them to drop out of school.

One (1) affidavit recites that the schools' architect was not hired on competitive bidding. One (1) affidavit recites that the new school location is in a small area near the West Craven High School and that children residing in affiant's area will have to travel an excessive distance.

Answers to the one hundred seventeen (117) interrogatories were served on plaintiffs on November 30, 1975.

Plaintiffs' "Response to Defendants' 56B Motion for Summary Judgment" first addresses itself to the untimeliness of defendants' Motion for Summary Judgment on their counterclaim. Secondly, it argues for an enlargement of time for plaintiffs to complete discovery and furnish responsive affidavits. Lastly, it argues that defendants have not furnished sufficient legal memoranda in support of their Motion for Summary Judgment.

In plaintiffs' "Memorandum in Opposition to Motion for Summary Judgment", they argue that additional time is needed for discovery and for development of factual issues and that Summary Judgment is inappropriate to a case of this nature. It further argues that the North Carolina State Law should be abrogated which permits the employment of architects without requiring competitive bidding on public projects. And it argues abuse of discretion on defendants' part for failure to obtain sufficient "public input" in determining the consequences to West Craven residents when selecting the school site.

Plaintiffs' interrogatories were answered before oral argument on December 1, 1975;

and, following the conclusion of oral argument, plaintiffs and defendants were given ten (10) days to file any additional memoranda, affidavits, or matter in support of or in opposition to the Motion for Summary Judgment. Defendants filed additional legal memoranda on all issues herein; plaintiffs filed nothing further. On December 16, 1975, this Court ordered counsel for plaintiffs and defendants to submit proposed findings of fact and conclusions of law for consideration by the Court on or before January 1, 1976.

Upon oral argument, December 1, 1975, defendants through counsel stipulated jurisdiction of the parties and subject matter in this Court.

NOW, THEREFORE, based upon the foregoing Findings of Fact, the Court makes the following:

## CONCLUSIONS

Summary Judgment appears appropriate and applicable to the facts and circumstances of this case.

■ Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate if it appears from pleadings, affidavits, depositions, and answers to interrogatories on file that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Mabey v. Reagan*, 376 F.Supp. 216 (1974, D.C.Cal.); *Toensing v. Brown*, 374 F.Supp. 191 (1974, D.C.Cal.); *Fletcher v. Bryan*, 175 F.2d 716 (1949, C.A.4 Va.); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013, rehearing denied, 326 U.S. 802, 66 S.Ct. 6, 90 L.Ed. 489 (1945); *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967, rehearing denied, 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593 (1944).

■ The Summary Judgment practice in federal courts has been referred to as an extremely important device for conservation of judicial time and costs of litigation where it is clear that no claim or defense exists as a matter of law. *Champion Brick*

*Co. v. Signode Corp.*, 263 F.Supp. 387 (1967, D.C.Md.). The procedure is intended to permit a party to pierce allegations of fact in the pleadings and to obtain relief by summary judgment where the facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of fact to be tried. *Engl v. Aetna Life Ins. Co.*, 139 F.2d 469 (1943, C.A.2 N.Y.).

■ As stated by the Fourth Circuit Court of Appeals, "The function of a motion for summary judgment is to smoke out if there is any case, that is, any genuine dispute as to any material fact and, if there is no case, to conserve judicial time and energy by avoiding unnecessary trial and providing speedy and efficient summary disposition." *Bland v. Norfolk & Southern R. Co.*, 406 F.2d 863 (1969, C.A.4 N.C.).

Paragraph "e" of Rule 56 provides in part as follows:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Even prior to the 1963 amendment adding these sentences, it had been held that summary judgment could be granted on affidavits not offset by opposing affidavits. *Board of Public Instruction v. Meredith*, 119 F.2d 712 (1941, C.A.5 Fla.), cert. den. 314 U.S. 656, 62 S.Ct. 109, 86 L.Ed. 526. The court's ruling on a motion for summary judgment is to be made on the record the parties have actually presented, not on one potentially possible. *Madeirense Do Brasil v. Stulman-Emrick Lumber Co.*, 147 F.2d 399 (1945 C.A.2 N.Y.), cert. den. 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982.

■ With regard to the tests to be applied in determining the motion for summary judgment, the courts have held that

when the moving party supports his motion by affidavit or other appropriate means which are uncontroverted, the court is fully justified in granting relief thereon. *Williams v. Baltimore & Ohio R. Co.*, 303 F.2d 323 (1962, C.A.6 Ohio). A mere scintilla of evidence is not enough to create an issue for the jury which is permitted to draw only those inferences of which the evidence is reasonably susceptible and may not be permitted to resort to speculation. A party may not escape summary judgment on the mere hope that something will turn up at trial. *Ayers v. Pastime Amusement Co.*, 283 F.Supp. 773 (1968, D.C.S.C.). The purpose of a motion for summary judgment is to avoid a useless trial which results in delay and expense, and while the courts should not look the other way to ignore the existence of genuine issues of material facts, neither should they strain to find the existence of such issues where none exists. *Mintz v. Mathers Funds, Inc.*, 463 F.2d 495 (1972, C.A.7 Ill.); *Dworman v. Mayor and Board of Aldermen*, 370 F.Supp. 1056 (1974, D.C.N.J.).

■ Speaking to the adequacy of the plaintiffs' pleadings, the courts have said that if an averment of a complaint is a mere conclusion or vague generality without specification and opposing affidavits assert facts which are undisputed, there is no genuine issue of fact, and the court may act upon that premise. *Farrall v. District of Columbia Amateur Athletic Union*, 80 U.S. App.D.C. 396, 153 F.2d 647 (1946). A party cannot rest on the allegations contained in its complaint in opposition to a properly supported motion for summary judgment, but must submit sufficient evidence supporting the claimed factual dispute to demonstrate that a judge or jury is required to resolve the parties' differing versions of truth at trial. *Lucas v. Philco-Ford Corp.*, 380 F.Supp. 139 (1974, D.C.Pa.). The court must determine whether the issues claimed by the party opposing summary judgment are in fact material and genuine issues. An issue may be material but not genuine. A pretended issue is one that no substantial evidence can be offered to maintain and is not genuine. *Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co.*, 149 F.2d 359 (1945, C.A.5 Miss.). A dispute as to an immaterial fact does not bar summary judgment. *Searer v. West Michigan Telecasters, Inc.*, 381 F.Supp. 634 (1974, D.C.Mich.).

In *Ando v. Great Western Sugar Co.*, 475 F.2d 531 (1973, C.A.10 Wyo.), the court held that a motion for summary judgment should be granted where, although suggestions by counsel pose genuine issues of material fact, factual issues raised are either irrelevant or spurious. Similarly, the court in *Carlander v. Dubuque Fire & Marine Co.*, 87 F.Supp. 65 (1949, D.C.Ark.), noted that "captious, immaterial and imaginary issues of fact may be found in any case, and if a motion for summary judgment is to serve any useful purpose, the court must unhesitatingly grant it when careful consideration of the facts reveals no real genuine issue of fact involved."

■ Rule 56 obviously places the burden on the moving party to support his motion for summary judgment by a convincing showing that genuine issues of fact are lacking; but once this is done it becomes incumbent on the party opposing the motion to come forward to show genuine issues of fact. As stated in *Bryant v. Kentucky*, 490 F.2d 1273 (1974, C.A.6 Ky.), "where the movant brings forward and supports his motion for summary judgment, his opponent must come forward to show genuine issues of fact, and mere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." See also *E. C. Ernst, Inc. v. General Motors Corp.*, 482 F.2d 1047 (1973, C.A.5 Ga.); *Hassan v. Hartford Ins. Group*, 373 F.Supp. 1385 (1974, D.C.Del.); *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391 (1974, C.A.4 N.C.).

With regard to the appropriateness of summary judgment in actions brought pursuant to the Civil Rights Act, 42 U.S.C.A. Section 1983, the case of *Sopp v. Gehrlein*, 232 F.Supp. 881 (1964, D.C.Pa.), in which the plaintiff brought an action under 42 U.S.C.A. Section 1983 charging that the de-

fendants had violated her civil rights in making an arrest of the plaintiff, appears pertinent. In granting summary judgment for the defendants, the court said: "Under the rule defendants are entitled to summary judgment forthwith if the pleadings, depositions, and affidavits, if any, show that there is no genuine issue as to any material fact." *See also, Gotkin v. Miller,* 379 F.Supp. 859 (1974, D.C.N.Y.).

*Soria v. Oxnard School Dist. Board of Trustees,* 328 F.Supp. 155 (1971, D.C.Cal.); vacated on other grounds 488 F.2d 579 (C.A.9 Cal.), cert. den. 416 U.S. 951, 93 S.Ct. 1961, 40 L.Ed.2d 301, was an action brought under 42 U.S.C.A. Section 1983 to compel the desegregation of the elementary schools in Oxnard, California. The trial court granted summary judgment in favor of the plaintiffs and said:

> "The Court first finds that the defendants' accountability, under the United States Constitution, for racial imbalance existing in the Oxnard Elementary Schools is an issue appropriate for resolution by way of summary judgment under Rule 56, Fed.R.Civ.P."

On appeal, the Ninth Circuit Court of Appeals said that, although it was an issue appropriate for summary judgment, the record revealed that there was a disputed genuine issue of fact and that summary judgment should not have been granted in this case.

Applying the law of Summary Judgment to the issues in the instant case, the Court concludes that Summary Judgment should be granted with respect to each issue, each of which is more particularly discussed below.

The first issue: "Whether the construction of the Middle Grades School at the planned site will discriminate against blacks and poor people." must be answered in the negative.

It is factually undisputed that the new Middle Grades School will provide higher quality educational opportunity and numerous educational advantages for the students attending the school. Educators have for many years realized that they can provide better education and better facilities for more students by consolidating on the junior high school level or as in this case, grades 6, 7, & 8. It is also undisputed that the creation of the Middle Grades School will result in further desegregation and improved racial balance of students in both the new school and the three old schools from which students will be taken. The students of the new school will be all 6th, 7th & 8th grade students in the entire western area of the county, black and white alike. This school is not being built in a white neighborhood nor in a wealthy neighborhood for the purpose of furthering segregation. Actually, the opposite is true; the proposed school site approximately centers in the poorest area and that which has the highest percentage of minority races.

Plaintiffs' claim of discrimination has been that black people and poor people may be placed under a hardship and thereby discriminated against because they live further from the new school site than other people.

This school is being located to serve a geographic area of approximately 400 square miles divided by a major river. The population is spread uniformly over the area to be served; some students will be close to the school and others will be distant. Moving closer to one student of necessity takes you further from another student. In traveling to and from the new school, all students will presumably be limited to the existing roads. A major river constitutes a geographic barrier which must be taken into account when considering travel by bus.

Defendants' undisputed evidence establishes that the population of Western Craven County is fairly uniformly distributed; similarly, the black population in Western Craven County is substantially uniformly distributed over the entire area to be served by the new school; and that the wealth, or lack thereof, is substantially uniformly distributed over the entire area to be served by the new school. Defendants have shown that 71.1% of the students live within 9.8

miles of the new school and 89.9% live within 13.2 miles. The school site is as near to the center of the student population to be served as is practically possible. The new school site is located in a predominantly black area which also has the lowest per capita income and average family income in the area. If the new school is moved away from this area, the claim of its residents would be greater and more persuasive than the plaintiffs' herein. The area where the school is located, and east of this site, is increasing in population from year to year while the western areas are decreasing in population. Students living in the community of Cayton in the northeastern corner and those living north and northwest of Vanceboro will be required to travel as far and further to the new school than the plaintiffs. Moving the school westwardly to accommodate the plaintiffs would adversely affect these students.

Bus transportation will be provided during regular school hours for every student wherever located. In addition, two activity buses, and more if necessary, will provide transportation for every student to and from any extra-curricular activity, sports practice or competition, special programs, or other authorized activity, conducted at the school.

Plaintiffs have neither stated a claim nor presented factual evidence by their Complaint, Response, or Affidavits which establishes how they are being treated differently than other persons in the western area of Craven County or any other area of the county. More particularly, they have not shown or suggested how they are being treated or affected differently from persons of the majority race or persons who are not poor. In other words, they have not shown that they are being discriminated against by reason of their race or wealth. On the other hand, defendants' evidence negates all indicia of discrimination.

All of the evidence before the Court demonstrates that sincere effort is being made by the defendants to eliminate discrimination and every vestige of a segregated school system. It is true that some of the students will be more distant from the school than others and this may cause some hardship, but it is not discriminatory on the basis of race or wealth. Some students will be subjected to that hardship, if in fact it is a hardship, no matter where the school is located.

All allegations in the plaintiffs' Complaint regarding racial discrimination are predicated on this Court's order in the case of *Hickman v. Board of Education*, (Civil Action 637, 7 August, 1970) requiring the Craven County Board of Education "to locate any new school or addition with the objective of eradicating the vestiges of the dual school system and of eliminating the effects of segregation."

Plaintiffs specifically state: "The action of the defendants in selecting the Spring Garden Road site for the proposed Middle School violates the Order of the Court in that it places an unduly harsh burden on students from low income families in the West Craven attendance area who wish to utilize public education facilities and who further wish to participate in extra-curricular and remedial activities. The majority of students thereby discriminated against are black, and the effect of such action will be to severely diminish the quality of education-related activities available to persons of low income in the West Craven area. The action of the defendants in selecting the Spring Garden Road site violates that portion of the Order of August 7, 1970, directing the Craven County Board of Education to 'operate, sanction and administer all school activities, services, facilities, transportation and programs on a non-racial basis.'"

There are no other allegations of racial discrimination; these are inextricably tied to *Hickman v. Board*. No further allegations explain exactly how the plaintiffs or their class have been discriminated against. Nothing shows how the location of the school will diminish the quality of education, or how the racial discrimination prohibitions of *Hickman v. Board* have been violated. No facts have been offered by the plaintiffs in support of their vague and

generalized reference to racial discrimination quoted above.

On the other hand, defendants have shown by uncontradicted evidence that the construction of the new school will advance integration by (1) improving the racial balance in all the schools in the western portion of Craven County; (2) being located in the geographic area which is the economically poorest and which is predominantly black in population; (3) providing free bus transportation for all students regardless of race to participate in all academic programs, extra-curricular activities, sports activities and other special programs, for which transportation is not now available at existing schools; (4) being racially unidentifiable; and (5) providing both races with more school activities, services, opportunities, facilities, transportation, and programs than they now receive in the existing schools. Therefore, the site selection and construction of the new school is in full compliance with the August 7, 1970, order of this Court in *Hickman v. Board* in that defendants have conclusively shown that the school has been located "with the objective of eradicating the vestiges of the dual school system and of eliminating the effects of segregation" and that the school will be operated on a "non-racial basis."

▇▇▇ The second issue, "Whether the electoral method by which the Craven County Board of Education was constituted at the time vitiates the action of the said Board in locating the school at the Spring Garden site", must be resolved in the negative.

The facts giving rise to this issue seem clear and without dispute. Under the electoral scheme in effect at the time the decision to locate the school was made, each school board member was nominated by members of his political party residing in the District in which he resided. Once nominated, all school board members ran at large in the General Election to be elected by all the voters of Craven County.[14] One member of the Board was elected in the foregoing manner to represent the New Bern City School District which encompassed all of the City of New Bern and approximately one-half of Number Eight (8) Township.[15] The New Bern City School System and the Craven County School System are separate and independent school administrative bodies although several co-operative activities, functions, and services are carried on between the two systems.

Two recent acts of the North Carolina General Assembly must be considered in the decision on this issue. On May 26, 1975, the General Assembly enacted a new statutory scheme for the election and terms of office of the members of the Craven County Board of Education.[16] This new scheme eliminates the seat on the Board representing the New Bern City School District, but also provides that the present incumbent will continue to hold office until his term expires, at which time his seat will be eliminated.

The North Carolina General Assembly, on June 25, 1975, amended North Carolina General Statute 115–18[17] by adding a proviso at the end thereof reading in pertinent part as follows:

"Provided, that where there are multiple school administrative units located within the county, and unless the county board is responsible for appointing members of the board of education of a city administrative unit located within the county, only those voters who reside within the county school administrative unit boundary lines shall be eligible to vote for members of the county board of education. Where the county board is responsible for appointing members of the board of education of a city administrative unit located within the county, the voters residing within that city school administrative unit shall be eligible to

---

14. N. C. Session Laws of 1967, Chapter 887, supra.

15. *Ibid.*

16. Chapter 376, Session Laws of the N. C. Legislature, 1975, ratified May 26, 1975.

17. See Note 11, supra.

vote for members of the county board of education.

The terms of office of the members of boards of education of all school administrative units in this state, who serve at the time the provisions of this act became effective, shall continue until members are elected and qualified as provided in this act unless modified by local legislation." Chapter 855, Session Laws 1975, Sections 1 and 3.

The quoted sections of this amendment to G.S. 115–18 became effective upon ratification of the act on 25 June, 1975.

Plaintiffs filed no affidavits, legal memoranda, or any other material of any kind whatsoever on this issue nor did they address the same in oral argument. Their Complaint does not specify or explain how their "rights to equal representation" have been violated or on what theory they claim that all past actions of the Board should be invalidated. Plaintiffs have apparently attempted to attack both the past actions of the Board and the future participation of the Board member representing the New Bern City School District.

The General Assembly of North Carolina is constitutionally empowered to appoint the members of the local boards of education and, prior to 1968, the Craven County Board of Education was in fact so appointed.[18] Therefore, if any member of the Craven County Board of Education was unconstitutionally elected in the inception, the act of the legislature of June 25, 1975, served to appoint him lawfully to his position and to enable him to exercise all of the powers of office as if he had been constitutionally elected. Plaintiffs' request to enjoin the member representing the New Bern City School District from future participation during the remainder of his term is without merit and will be denied.

■ With regard to past actions taken by the Board while constituted as stated above, there is no legal authority for the proposition that the actions of the Board should be retroactively invalidated. This Court is of the opinion that the members of the Board were elected in the manner required by law and are therefore entitled to the status of *de facto* officeholders, if not *de jure* officeholders. Their actions as *de facto* school board members were conducted under color of title as *de facto* officers and their actions as such are valid so far as the public or third parties who have an interest in them are concerned. The right and title of such *de facto* officers will be conclusively presumed. *See*: U. S. ex rel. *Doss v. Lindsley,* 148 F.2d 22, cert. den. 325 U.S. 858, 65 S.Ct. 1195, 89 L.Ed. 1978 (1945, CCA Ill.); *United States v. Nussbaum,* 306 F.Supp. 66 (1969, D.C.Cal.); *Waite v. City of Santa Cruz,* 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552; *U. S. v. Groupp,* 333 F.Supp. 242 (1971, DC.Maine).

■ The principle applicable here has been very concisely stated in 78 C.J.S. Schools and School Districts § 113, *De Facto Officers:*

"One who has entered into the possession and assumed to exercise the functions of a district of other local school office by virtue of an apparent election or appointment is an officer *de facto,* and more particularly if there is acquiescence on the part of the public or public authorities, and this is so although he is not eligible to hold the office, his election or appointment is irregular or illegal, he has failed to qualify, as by taking an oath or giving a bond, the district for which he purports to act has been irregularly or illegally organized, or he has vacated his office by removing from the district."

■ The Court is also of the opinion that the plaintiffs are attempting an impermissible collateral attack on the composition, eligibility, and status of the Craven County Board of Education which cannot be condoned by the courts. Such an attack is properly made in a direct proceeding in the nature of *quo warranto.*

---

18. G.S. 115–19 (1955, Chapter 1372, Article 5) provided for appointment of members of the County Board of Education for each county by the general Assembly biennially.

The entire community has a substantial interest in the stable and orderly administration of the schools. To retroactively invalidate the actions of the Craven County Board of Education would have a disastrously disruptive effect on the administration of the Craven County School System and, therefore, on the education of Craven County students.

For all of the foregoing reasons, the Court is constrained to answer this issue in the negative and grant Summary Judgment for the defendants on this issue.

The third issue: "Whether federal funds are being expended in a discriminatory fashion", must also be answered in the negative.

Plaintiffs have offered no evidence on this issue. Defendants have filed detailed accountings of all funds received and expended in the Craven County School System in recent years.

The uncontroverted evidence shows that State and local funds are required by law to be spent on an equitable per student basis according to the number of students enrolled at each school and those funds have been so expended; that State SEED funds allotted to Craven County Schools have all been spent in schools in the Western Craven County area; that six times more funds were spent in 1974 for maintenance and capital improvements on schools in the western portion of the county than on all other schools in the system; that from 1970 through 1975, 61% of all federal funds have been expended in western area schools; that students in the western area have received 240% more per capita of the federal funds than all other students in the system; and western area students have received 151% more NDEA funds per capita than all other students.

These figures are supported by the accountings placed in evidence and they are undisputed by the plaintiff. These figures are susceptible of no other interpretation than that more federal funds and other funds have been expended in western area schools in the last five years than in all

other schools in the system combined. If anything, the plaintiffs and members of their class have been the beneficiaries of discriminatory treatment against other individuals in other parts of the county. Therefore defendants are entitled to Summary Judgment on this issue as a matter of law.

The fourth issue, "Whether the Craven County Board of Education manifestly abused its discretion in locating the new school", must be answered in the negative.

N.C.G.S. Section 115–31 establishes a presumption of regularity and correctness in favor of the Craven County Board of Education in the following language:

"(b) In all actions brought in any court against a county or city board of education, the order or action of the board shall be presumed to be correct and the burden of proof shall be on the complaining party to show the contrary."

This statute was applied in the recent case of *Eggimann v. Board of Education*, 22 N.C.App. 459, 206 S.E.2d 754 (1974), and the Court therein also noted that upon a motion for summary judgment, both the opposing and moving parties are entitled to any presumption that is applicable to the facts before the Court. *Ibid.*, at 463, 206 S.E.2d 754.

This issue raises the question whether the actions of the Craven County Board of Education in selecting the site for the new Middle Grades School were reasonable. Plaintiffs must fail on this issue unless it appears that the defendants manifestly abused their discretion in selecting the site.

During the School Year of 1973–74, the educational experts of the North Carolina Department of Instruction, School Planning Division, conducted a survey of the immediate and long range needs of the Craven County School System and recommended the new Middle Grades School in the western area. The Craven County Board of Education began serious consideration of this recommendation shortly after the favorable school bond referendum in North

Carolina in November, 1973. At its meeting of January 31, 1974, the Board agreed to proceed with the plans and construction of such a school and requested assistance of the educational experts from the North Carolina Department of Public Instruction, Division of School Planning, in selecting a site for the new school. At that same meeting, the Board directed the Superintendent and his staff to investigate other Middle Grades Schools and write Educational Specifications for every scholastic aspect of the new school. The Board further directed the employment of Mr. Bobby Stephens of the firm of Stephens & Cardelli as architect for the new school. The Assistant Superintendent for Instruction supervised the preparation of the Educational Specifications, using the suggestions and experience of other school systems, principals, teachers, and other education personnel. Every aspect of the education program to be conducted at the new Middle Grades School was studied and taken into consideration in the planning. These Educational Specifications were submitted to and subsequently approved by the North Carolina Department of Public Instruction and then turned over to the architect for incorporation in the design and construction of the new building. Periodic reports were made to the Board of Education by the architect on his progress in the design and engineering aspects of the new school plant. During this time, an exhaustive search for suitable school sites in the Western Craven County area was being conducted by the Board Members, principally by Mr. S. L. "Tom" Adams. Six sites were investigated but only three were available for purchase. These three were submitted to the Division of School Planning for evaluation as well as to other agencies of the state and county governments. All of these agencies recommended as their first choice the site that was ultimately purchased by the Board. On August 29, 1974, the Board voted to purchase the Hopewell Tract and the funds were appropriated for the purchase by the Craven County Board of Commissioners on September 16, 1974, after full consideration of the matter. In March, 1975, at the request of two members of the Board and their constituents, a special public meeting was held to provide a public hearing on the objections to the new school site. A large delegation of citizens from the western area was received at the Board's regular meeting on March 27, 1975 and the school site location was again debated. At that same meeting, after full and thorough discussion, the Board voted to retain and continue with its present plan for the West Craven Middle Grades School and its location as previously agreed upon and approved. All of the foregoing actions of the Board were given substantial county-wide publicity by the local newspaper.

Defendants' evidence, summarized above, leaves no doubt that a great deal of thought, study, public debate, and careful consideration went into the Board's selection of the new school site. The Board accepted the counsel and guidance of educational experts from the North Carolina Department of Instruction; it determined the educational and scholastic needs of its students; it employed an experienced school designer; and it made a thorough search for sites and selected the one recommended unanimously by various experts. These are not the actions of a Board acting capriciously, arbitrarily, or in manifest abuse of its discretion.

The plaintiffs have offered no evidence which controverts any of these material facts. Defendants' evidence overwhelmingly shows that the Board acted reasonably and well within the bounds of its discretion. Defendants are therefore entitled to Summary Judgment on this issue.

The fifth issue, "Whether the Craven County Board of Education violated the laws and Constitution of North Carolina by failing to select an architect for the new school by means of competitive bidding", must be answered in the negative.

Defendants agree with the plaintiffs that no competitive bidding process was followed in the selection and employment of an architect for the design and construction

of a new Middle Grades School. Therefore there is no disputed issue as to any material fact with regard to this claim by the plaintiff and it is an appropriate issue for resolution by Summary Judgment.

N.C.G.S. 133–1.1, provides, in substance, that any public building built in excess of $45,000.00 shall require plans and specifications by a registered architect in accordance with Chapter 83 of the General Statutes.

N.C.G.S. 83–4 provides for the establishment of the North Carolina Board of Architecture and delegates certain legislative authorities and powers to that Board. Pursuant to those powers so delegated, the North Carolina Board of Architecture has adopted "Rules and Regulations" which provide that it shall be "gross unprofessional conduct" for an architect to submit competitive bids for professional services or otherwise knowingly compete with another architect on the basis of professional charges.[19]

N.C.G.S. 133–4 makes the violation of the provisions of Chapter 133, and the provisions of Chapter 83, and its rules and regulations by incorporation by reference, a crime calling for specific punishment.

The American Institute of Architects has also promulgated "Standards of Professional Practice" for architects which provide that an architect shall not enter into competitive bidding against another architect on the basis of compensation.

Recognizing that architects are not allowed to competitively bid, the State of North Carolina, Department of Administration, Property Control and Construction Division, promulgates a schedule of architectural fees to be allowed in the construction of public works, including classroom buildings, etc. Any architect hired to construct a public building in the State of North Carolina must be paid according to this schedule, thus, by implication, excluding competitive bidding.

The contract between the architect and the Craven County Board of Education for his architectural services in the design and construction of West Craven Middle Grades School, containing among other things, the architect's fee rate, must be and has been submitted to and approved by the North Carolina Department of Public Instruction.

It would appear, therefore, that not only is competitive bidding for architectural services not required, the contrary is compelled by law and made a serious crime for doing otherwise.

Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment attempts to argue that the rule of the North Carolina Board of Architecture against competitive bidding is price-fixing in violation of the Sherman Antitrust Act. This argument constitutes a collateral attack on the validity of the rule promulgated by the Board of Architecture and is totally irrelevant and immaterial to the question before the Court in this case. The sole question before this Court, as alleged by plaintiffs, is whether or not the defendants violated the North Carolina Statutes by not conducting competitive bidding for the architect's services. The defendants are in full compliance with the law as it existed at the time the architect was hired and as it presently exists in North Carolina. The question of the validity of the rule promulgated by the Board of Architecture is not before the Court and would be inappropriate for the Court to consider on this issue.

The facts are not in dispute and the sole question before the Court is one of law: Did the Craven County Board of Education violate North Carolina law by not competitively bidding for the architect's services? The answer is No, and the defendants are therefore entitled to Summary Judgment on this issue as a matter of law.

██ The sixth issue, "Whether plaintiffs are guilty of such laches as should in equity bar this action", is not required to be answered herein because the Court's conclusions, as stated above, have determined all issues on the merits. However, even if this were not the case, this Court would be constrained to deny the requested relief because of plaintiffs' laches in instituting this

**19.** N. C. Board of Architecture, "Rules, Regulations, Laws of the State", 1974.

suit. Despite the public meetings and discussions by the School Board, public hearings, widespread publicity, two publicly held votes on the site selection, and personal participation of at least one of the plaintiffs, over a period of at least 18 months, the institution of this action by the plaintiffs was inexcusably delayed until after substantial sums of money had been spent or costs incurred by the defendants and the defendants were just before advertising for bids for construction of the new school. It is the experience of this Court that the delay caused by the institution of this action will cause increased costs and substantial prejudice to the defendants. The plaintiffs have offered no excuse for the delay and prejudice occasioned thereby.

Defendants have not offered sufficient evidence in support of Summary Judgment on their counterclaim and, therefore, Summary Judgment as to defendants' counterclaim should be denied.

NOW, THEREFORE, based upon the foregoing findings and conclusions, it is ordered that Summary Judgment be and it is hereby entered in defendants' favor as to each issue raised by plaintiffs' complaint; the action of the plaintiffs is hereby dismissed with prejudice; and defendants' Motion for Summary Judgment on their counterclaim is denied.

Let this order be entered forthwith.