Shirley PITTMAN, Bruce Berndt, Ralph Cusick, David T. Peterson, Gwendolyn Steele–Boutte, Frederick Sears, individually and as class representatives, Plaintiffs,

v.

The CHICAGO BOARD OF EDUCATION, Roland W. Burris, Attorney General of the State of Illinois, Richard M. Daley, Mayor of the City of Chicago, Defendants.

No. 92 C 2219.

United States District Court, N.D. Illinois, Eastern Division.

June 30, 1994.

---

David Lincoln Ader, Ronald S. Cope, John F. Donahue, Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, for Shirley Pittman, Bruce Brendt, Ralph Cusick, David T. Peterson, Gwendolyn Steele–Boutte, Frederick Sears.

Joyce Combest Price, Iris Ellen Sholder, Camille Elaine Willis, Michael Joseph Hernandez, William J. Quinlan, City of Chicago Bd. of Educ., Chicago, IL, for Chicago Bd. of Educ.

Gladys M. Stevens, Margaret Ann Marcouiller, Illinois Atty. General's Office, Chicago, IL, for Roland W. Burris.

Kelly Raymond Welsh, Susan R. Lichtenstein, Sharon Baldwin, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for Richard M. Daley.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Shirley Pittman, Bruce Berndt, Ralph Cusick, David T. Peterson, Gwendolyn Steele–Boutte, and Frederick Sears bring this twenty-two count complaint, challenging the validity of the Chicago School Reform Act, as amended. Presently before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted.

### I. Background [1]

In 1988, the Illinois General Assembly enacted the Chicago School Reform Act in an effort to improve the quality of the ailing Chicago public school system. Two years later, the Illinois Supreme Court concluded that the portion of the Act providing for local school council elections was constitutionally deficient, and thus struck down the entire statute. *Fumarolo v. Chicago Bd. of Educ.*, 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283, 1287 (1990). The Illinois General Assembly amended the statute in the summer of 1991, attempting to remedy those portions of the Act which the Supreme Court found wanting. Plaintiffs now challenge the constitutionality of the amended Act.

In the present action, as in the *Fumarolo* litigation, two portions of the Act are challenged: the section providing for the election of the local school councils, and the section abolishing "tenure" for Chicago school principals. Each section shall be considered in turn.[2]

### A. Local School Councils

In order to decentralize the Chicago school system, and "[t]o place increased authority for individual school decisions at the individual school level," *Fumarolo*, 153 Ill.Dec. at 180–81, 566 N.E.2d at 1286–87, the Act established local school councils for each grammar school and each high school in the Chicago public school system. These local school councils were accorded broad responsibilities, including: (1) selecting a principal; (2) evaluating the principal's performance, based in part upon criteria established by the local school council; (3) approving the expenditure plan prepared by the principal with respect to funds allocated to the school by the Board of Education; (4) making recommendations regarding curriculum, textbook selection, and attendance policies; (5) approving a school improvement plan; (6) evaluating the allocation of teaching and staff resources; (7) making recommendations to fill open teaching positions; and (8) requesting training and assistance from the Board of Education in a variety of areas, including school budgets, educational theory, and personnel selection. *See* Ill.Rev.Stat.1989, ch. 122, par. 34–2.3; *Fumarolo*, 153 Ill.Dec. at 189, 566 N.E.2d at 1295.

The local school councils are comprised of eleven voting members: the principal of the school, two teacher representatives, two residents of the community served by the school

---

1. The parties have submitted an agreed statement of uncontested facts, thus making summary judgment appropriate. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

2. The amendments enacted in 1991 only altered that portion of the Act found constitutionally wanting by the *Fumarolo* court. As a result, except where otherwise noted, the following discussion of the Act's provisions applies equally to the original statute and the amended version.

("community representatives"), and six parents of students currently enrolled in the school ("parent representatives").[3] In addition to the above responsibilities, each local school council selects one of its parent or community representatives to sit on a subdistrict council. There are eleven such subdistrict councils, each of which elects and evaluates a subdistrict school superintendent and coordinates the activities of the local school councils within its subdistrict. In addition, each subdistrict council selects one of its members to sit on the school board nominating commission. This body is therefore comprised of eleven subdistrict council representatives, as well as five additional members appointed by the mayor. The commission, in an open forum, interviews candidates for the board of education, and presents the mayor with a slate of three candidates for each vacant seat on the board, from which the mayor fills the vacancy.

The focus of the litigants' challenge in *Fumarolo* was the scheme by which local school council parent and community representatives were elected. Under the original Act, only parents could vote for parent representatives, and only non-parent community members could vote for community representatives. Furthermore, the Act provided that "[e]ach person eligible to vote for an office on the local school council to be filled at an election is entitled to vote for as many candidates as are to be elected to fill that office." Ill.Rev.Stat. ch. 122 ¶ 34–2.1(b). As a result, parent voters were allotted six votes each, while community members were only entitled to two votes. The Illinois Supreme Court concluded that this voting scheme violated the "one person, one vote" guarantee implicit in the equal protection clauses of the United States and Illinois Constitutions. *Fumarolo*, 153 Ill.Dec. at 194, 566 N.E.2d at 1300. The Court went on to hold that, because the local school councils were unconstitutionally elected, the selection of the subdistrict councils and school board nominating commission also violated constitutional principles. Ultimately, therefore, the Court concluded that the nominating commission could not properly select candidates for the board of education. *Id.* 153 Ill.Dec. at 197, 566 N.E.2d at 1303.

Following the Illinois Supreme Court's decision in *Fumarolo*, the Illinois General Assembly passed an interim measure, Public Act 86–1477, which directed the Mayor of the City of Chicago to appoint the members of each local school council, each subdistrict superintendent, the school board nominating commission, and the board of education within seven days. The mayor obtained a list of the individuals then sitting as members or officers of those bodies, and appointed those persons to the same positions they had held under the unconstitutional provisions of the School Reform Act. Nine months later, on September 11, 1991, the amendments to the School Reform Act, Public Acts 87–454 and 87–455, became effective. While the basic structure of the local school councils remained the same, *i.e.*, six parent representatives and two community representatives, the voting scheme was altered. The Act now provides:

> Each eligible voter shall be entitled to cast one vote for up to a total of 5 candidates, irrespective of whether such candidates are parent or community resident candidates.

105 ILCS 5/34–2.1(d)(iii). Plaintiffs in the present action now challenge both the mayor's action in appointing the existing members of the various bodies to the positions to which they were unconstitutionally elected or selected, as well as the amended provisions providing for the election of local school councils.

B. Principals

The other major issue presented in plaintiffs' complaint relates the portions of the School Reform Act which alter the nature of Chicago Public School principals' employment. A brief history of the statutory provisions regarding principals' terms of employment is appropriate. In 1902, pursuant to the suggestion of an Education Commission appointed by then-Chicago mayor Carter Harrison, the Chicago Board of Education

---

**3.** For local school councils serving high schools, the membership also includes one student currently enrolled at the high school.

promulgated a rule which essentially provided that principals and teachers who successfully completed a three-year probationary period were entitled to permanent employment. This system remained in place until the Board became embroiled in *People ex rel. Fursman v. City of Chicago,* 278 Ill. 318, 116 N.E. 158 (1917), which involved a labor dispute between the Board and various educational employees. In 1916, during the course of the *Fursman* proceedings, the Board of Education amended its rules to remove the section providing for permanent employment for teachers and principals. The following year, the Illinois Supreme Court ruled in *Fursman,* and concluded that the Board of Education lacked the authority to contract beyond the ensuing school year, thus implicitly upholding the Board's decision to eliminate the "tenure" provisions in its rules.[4]

The day after the *Fursman* decision was filed, the Illinois General Assembly enacted emergency legislation which restored the tenure which principals and teachers had previously enjoyed. Specifically, the relevant statute provided:

> Appointments and promotion of teachers, principals and other educational employees shall be made for merit only, and after satisfactory service for a probationary period of three years, (during which period the board may dismiss or discharge any such probationary employee upon the recommendation, accompanied by the written reasons therefor, of the superintendent of schools), appointments of teachers and principals shall become permanent, subject to the rules of the board concerning conduct and efficiency, and subject to removal for cause....

Laws of Illinois, 723, 731 (1917). This language remained in the statute until 1987. *See* Ill.Rev.Stat. ch. 122, § 34–84 (1987). In the Chicago School Reform Act, however, the legislature abolished the "tenure" system for principals, and instead provided that principals would be employed under four-year, renewable performance contracts.

## II. Discussion

### A. Local School Councils

The crux of plaintiffs' argument with respect to the local councils is that the manner in which the representatives are elected is constitutionally defective.[5] Acknowledging that there are no cases that have dealt with a system identical to the one here, the parties have focused their discussion on cases which deal with a variety of "candidate restrictions," and their impact on the right to vote. *See, e.g., Trafelet v. Thompson,* 594 F.2d 623 (7th Cir.) (age limitation on judicial candidates), *cert. denied,* 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (system which essentially limits candidates to members of Republican or Democratic parties); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967). Although none of these cases is sufficiently analogous to direct a conclusion regarding the School Reform Act, the principles set forth do, to some degree, provide us with meaningful guidance. A careful analysis of these cases is therefore appropriate.

In *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), the Court was asked to assess the validity of the means by which the governing body of the City of Virginia Beach and Princess Anne County, which had been consolidated, was elected. This territory consisted of seven boroughs, three of which were primarily urban, three primarily rural, and one primarily tourist. The Virginia legislature provided for a governing council of eleven members under the following system:

> Four members are elected at large without regard to residence. Seven are elected by the voters of the entire city, one being

---

4. As used in this opinion, "tenure" is a term of convenience rather than of art. It merely refers to the permanent employment provided by the legislature prior to the School Reform Act, and earned by the plaintiffs in the present action.

5. The equal protection clauses of the United States and Illinois Constitutions are coextensive; accordingly, disposal of the federal claim necessarily results in disposal of the state claim as well. *See Fumarolo,* 153 Ill.Dec. at 184, 566 N.E.2d at 1290.

required to reside in each of the seven boroughs.

*Dusch,* 387 U.S. at 114, 87 S.Ct. at 1555. This was termed the "Seven–Four Plan."

Electors of five of the boroughs brought suit, claiming that the Plan violated the principles of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which established the so-called "one person, one vote" rule.[6] The district court disagreed, and upheld the Plan. The Court of Appeals reversed, and the case went to the Supreme Court. The Court initially noted that the Plan made "no distinction on the basis of race, creed, or economic status or location. Each of the 11 councilmen is elected by a vote of all of the electors in the city." The Court then considered the residency restrictions placed on seven members of the council, and concluded that such restrictions did not doom the Seven–Four Plan. Quoting from an earlier case, the Court stated:

> "The statute uses districts ... merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interest of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator."

*Dusch,* 387 U.S. at 115, 87 S.Ct. at 1556 (quoting *Fortson v. Dorsey,* 379 U.S. 433, 438, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)). In short, the Court concluded that because the entire population elected all members of the council, each member of the council, regardless of that member's residency, must be sensitive to the needs of the population as a whole.

This is not to suggest, however, that there was no reason to have the residency alloca-

tions provided for in the statute. The Court adopted the reasoning of the District Court:

> "The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give due consideration to questions presented throughout the entire area."

*Dusch,* 387 U.S. at 116, 87 S.Ct. at 1556 (quoting the District Court). Concluding that this justification refuted any indication of "invidious discrimination," the Court held the Seven–Four Plan valid.

The same is true here. Local school council members are required to represent the individuals who elected them. *See Dallas County v. Reese,* 421 U.S. 477, 480, 95 S.Ct. 1706, 1707–08, 44 L.Ed.2d 312 (1975) (acknowledging the "basic teaching that elected officials represent all of those who elect them, and not merely those who are their neighbors"). Indeed, it is in their best interest to do so, since any individual parent, for example, who does not consider and represent the views of all of the electors may well find himself or herself ousted in the next election.[7]

This is not to suggest, of course, that parent representatives and community representatives are fungible. As discussed further below, parents have a unique and significant interest in the education of their children. But just as parent representatives and community representatives are not fungible, it is likewise true that not all parent representatives are fungible. It is this basic concept which justified the holding of *Dusch,* and which dictates our decision today. Voters are free to elect individuals who best represent their views, and those individuals, in turn, will represent the electors' views. In

---

**6.** The plaintiffs based their claim upon the fact that the boroughs varied widely in population; the urban boroughs were extremely populous, while the rural boroughs were sparsely populated. Accordingly, the plaintiffs argued, the council members did not represent equal numbers of people, as required by *Reynolds.*

**7.** The dubious wisdom and administrative efficiency of the legislature's populist approach of delegating supervisory and policy-making authority to local school councils dominated by lay members is not before us. The Illinois General Assembly must ultimately judge whether this experiment has been successful, that is, has there been a resulting improvement or deterioration in Chicago public education.

the present action, plaintiffs would have us adopt the opposite presumption, *i.e.,* that parents are essentially a homogeneous voting block, insensitive to the views of those who elected them. However, we are bound to reject such a presumption. As the Supreme Court has noted:

> [T]he Court of Appeals relied on a theoretical presumption ... that elected officials will represent the districts in which they reside rather than the electorate which chooses them. But that is precisely the proposition rejected in *Dusch.*

*Dallas County,* 421 U.S. at 481, 95 S.Ct. at 1708.

We are likewise unwilling to accept the implicit contention that the disparity of seats between parent representatives and community representatives automatically dictates a finding of unconstitutionality. We initially note that in *Dusch,* the Court acknowledged that, given the population breakdown, the voters of the two largest boroughs could elect all eleven council members, even though the elections were at large. It is equally apparent that the voters of those two urban boroughs could likewise always have a majority of the council comprised of their own residents; *i.e.,* the two resident-designated members, plus the four at-large members. Despite this fact, the Court was unwilling to rule the Plan unconstitutional absent some showing that it actually served to "minimize or cancel out" the voting strength of elements of the population. *Dusch,* 387 U.S. at 117, 87 S.Ct. at 1556–57.[8] Accordingly, a disparity in the number of seats held by a particular group does not inexorably lead to a conclusion of unconstitutionality.

We acknowledge that, unlike the situation in *Dusch,* the School Reform Act mandates a discrepancy in seats in favor of one particular group. We are not convinced, however, that this distinction in turn mandates a different

result, since the basic premise of *Dusch, i.e.,* persons elected at large represent all electors, remains true. In any event, we are unwilling to find the School Reform Act unconstitutional based upon this fact, because we find that the allocation of seats on local school councils survives equal protection scrutiny. Our threshold inquiry is to determine the appropriate standard under which the election scheme is to be reviewed. Plaintiffs maintain that "any alleged infringement of the right of citizens to vote must pass strict scrutiny." This contention is simply incorrect. In *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983), the Supreme Court noted that "[c]onstitutional challenges to specific provisions of a State's election laws ... cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." Instead, the Court set forth the following balancing test to be applied in considering the constitutionality of a given election law:

> [A] court ... must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recog-

---

8. We assume that such a showing would be even more difficult in this case than in *Dusch.* Although the parties have not provided us with the number of community resident voters versus the number of parent voters, it is likely that the former is significantly larger than the latter. Accordingly, community residents would need to demonstrate not only that the elected local school council actually minimized their voting strength, but also that they were powerless to elect a local school council which would effectively represent their interests. Because we are unwilling to assume that parents are uniformly unable to represent the interests of community residents (assuming such "interests" are themselves even identifiable), a showing that community residents are truly powerless in electing a local school council would be virtually impossible to make.

nized, there is no substitute for the hard judgments that must be made.

*Id.* at 789–90, 103 S.Ct. at 1570 (citations and internal quotation marks omitted). Accordingly, we shall consider the provisions of the School Reform Act in light of the test enunciated in *Anderson.*

The "character and magnitude" of any injury to plaintiffs' voting rights under the present system is relatively small. All voters, be they parents or community representatives, are entitled to exercise the same number of votes, and may vote for whichever candidates they choose. In addition, any eligible person interested in running for a position on the local school council may do so; no particular individual or interest is precluded from being a candidate. This case is thus unlike those cited by plaintiffs in which a strict scrutiny standard applied. For example, in *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Supreme Court found that Ohio's election law was structured such that only Democratic and Republican party candidates could typically qualify on the ballot for President and Vice President. The court concluded that "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Id.* at 31, 89 S.Ct. at 11. Likewise, in *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the State of New York limited the right to vote for school board members in certain areas to parents of enrolled children and owners or lessees of taxable property in the district and their spouses. Because the statute completely precluded other, presumably interested, citizens from voting, the Supreme Court concluded that it failed to satisfy a strict scrutiny standard. *Id.* at 630–633, 89 S.Ct. at 1891–1893. Similarly, in *Goldman–Frankie v. Austin,* 727 F.2d 603 (6th Cir.1984), the Sixth Circuit noted that Michigan's election law essentially foreclosed independent candidates access to the ballot. The court concluded that the relevant statutory provision, which granted voters "a franchise to elect members of the Michigan Board of Education and then limit[ed] that franchise to those who support a party nominated candidate," was unconstitutional. *Id.* at 607.

Plaintiffs suggest, however, that the fact that community residents are entitled to run, and, indeed, are guaranteed positions on the local school councils is irrelevant, because the allocation of seats effectively limits the influence that community representatives might have. Accordingly, they argue, the burden on their right to vote is substantial. We disagree. First, as noted above, the mere fact that there are more seats allocated to parents on the local school councils does not mean that community residents will go underrepresented. Because the elections are at large, each elected local school council member is both presumed and bound to represent the interests of all of the electors. Furthermore, there is simply no case which supports plaintiffs' contention that a system which allocates varying numbers of seats on an elected board requires strict scrutiny. In fact, both United States and Illinois Supreme Court cases impliedly refute such a contention. *See, e.g., Quinn v. Millsap,* 491 U.S. 95, 109, 109 S.Ct. 2324, 2333, 105 L.Ed.2d 74 (1989) ("Missouri cannot *entirely* exclude from eligibility for appointment to this board all persons who do not own real property . . . .") (emphasis added); *Fumarolo,* 153 Ill.Dec. at 193–194, 566 N.E.2d at 1299–1300 ("[T]here may be a rational relationship between giving parents of children currently attending the public school an increased role in local educational governance . . . ."). Because all members of the community are entitled to vote and receive an equal number of votes, and because no individual or "interest" is precluded from running for and serving on the local school councils, we conclude that the magnitude of any injury to plaintiffs' voting rights is limited.[9]

We now consider the reasons proffered by defendants in support of the provisions relating to the election and composition of the

9. We also note that this system would be automatically subject to strict scrutiny if the distinction were based upon some suspect class, such as race. *See Kramer v. Union Free Sch. Dist.,* 395 U.S. 621, 628 n. 9, 89 S.Ct. 1886, 1890 n. 9, 23 L.Ed.2d 583 (1969). In the present case, however, it is uncontested that plaintiffs are not part of a "suspect class."

local school councils. After hearing testimony from a variety of groups and reviewing voluminous research on the subject of education, the Illinois General Assembly concluded that "parents have special knowledge of the education needs of their children and a unique motivation to secure quality education for them." Public Act 87–454 (1991). In addition, the General Assembly found that "higher levels of student performance occurs [sic] in schools where parents have a significant voice in local school decision making and are otherwise significantly involved in the local school's activities." *Id.* In short, the legislature concluded that, because the persons most immediately and directly interested in the education of children are the children's parents, those parents should play a predominant role in shaping the means by which the children are educated. Accordingly, the General Assembly allotted parents a significant number of seats on each local school council.

In assessing the validity of the election scheme, this court is not to act as a "super-legislature." As the Supreme Court has stated:

States are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker."

*Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979)). We conclude that the findings set forth by the legislature clearly justify the distribution of seats on the local school councils. It is entirely appropriate to give the persons most directly interested in the education of children, *i.e.,* parents, a greater role than others in facilitating the running and improvement of the schools. And there can be little question that parents are uniquely interested in the quality of education. Consistent with the findings of the Illinois General Assembly, courts have long recognized that parents should and do play a vital role in the upbringing and education of their children.[10] *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972) ("[T]he primary role of the parents is now established beyond debate as an enduring American tradition."); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The Illinois Supreme Court expressly acknowledged this point in *Fumarolo:*

[A]s the plaintiffs say, there may be a rational relationship between giving parents of children currently attending the public school an increased role in local educational governance and improvement in the school....

*Fumarolo,* 153 Ill.Dec. at 193–194, 566 N.E.2d at 1299–1300. In sum, the legislature has advanced legitimate, significant interests related to the education of public school children which justify the increased role for parents provided for the School Reform Act. Weighing these compelling interests against the limited burden on plaintiffs' voting rights, we conclude that the election and representation scheme provided for in the School Reform Act, as amended, satisfies Fourteenth Amendment requirements.

Plaintiffs also argue that the actions taken by the legislature and the Mayor of Chicago in the interim period between the Illinois Supreme Court's decision in *Fumarolo* and the amendment of the School Reform Act deprived them of their Fourteenth Amendment rights. Following the *Fumarolo* decision, the General Assembly passed Public Act 86–1477, which required the Mayor of the City of Chicago to appoint the membership of every local school council, every subdistrict council, the School Board

**10.** This is not to suggest, of course, that other members of the community are disinterested in the education of youth. Plaintiffs correctly assert that all of society is interested in ensuring that children receive the benefits of quality education. The Assembly, however, concluded that parents of children attending a particular school have a unique and greater interest in the direction and improvement of that school. We simply cannot conclude that that determination and the statutory provisions which stem from it are irrational or otherwise constitutionally infirm.

Nominating Committee, and the Board of Education within seven days of the Act's January 11, 1991 effective date.[11] Given the large number of positions to be filled and the limited amount of time provided for the appointments, plaintiffs assert that the Mayor had no choice but to appoint the sitting members of each of the bodies to the same positions, which is precisely what he did. According to plaintiffs, this Act and the Mayor's actions thus constituted a "perpetuation of the discrimination" which had been found unconstitutional in *Fumarolo*. The plaintiffs conclude:

> As a result of the *Fumarolo* case, the legislature as well as the defendants were plainly put on notice that the discriminatory scheme that they sought to perpetuate . . . was already unconstitutional. The legislature's decision to maintain the status quo when it knew that the status quo was unconstitutional operates as a violation of each legislator's oath of office, a violation of the public trust, and mocks the judicial system.

Accordingly, the plaintiffs argue, the actions taken by the various bodies are invalid.

However, even if the legislature and the Mayor's actions in fact "perpetuated" the unconstitutional scheme struck down in *Fumarolo*, the actions of the interim bodies are protected by the de facto officer doctrine. As the one Illinois court has noted:

> It is a general principle of law, that the ministerial acts of an officer de facto are valid and effectual when they concern the public, and the rights of third persons, although it may appear that he has no legal or constitutional right to the office. The interests of the community imperatively require the adoption of such a rule.

*Andrulis v. First Nat'l Bank*, 4 Ill.App.3d 436, 281 N.E.2d 417, 420 (1972) (quotations omitted). In the present case, the General Assembly temporarily granted to the Mayor of Chicago the power that he held prior to passage of the initial School Reform Act. The various members were thus serving with apparent good title, and are therefore entitled to treatment as de facto officers. Indeed, this conclusion is further supported by the fact that the solution devised by the General Assembly and the Mayor was suggested by the *Fumarolo* court itself. In concluding the *Fumarolo* opinion, the Illinois Supreme Court stated:

> The City has acted under the Reform Act . . . to put a board of education in place and may wish to consider whether the board formed under the Reform Act should be treated as a *de facto* board of education until another board is designated and qualified by law.

*Fumarolo*, 153 Ill.Dec. at 203, 566 N.E.2d at 1309. The Mayor did, in effect, just that, and extended the temporary remedy to include the local school councils and the subdistrict councils. To assert that implementing a solution initially suggested by Illinois' highest court "mocks the judicial system" is therefore somewhat disingenuous. Furthermore, the only possible remedy for this alleged constitutional violation is to invalidate the actions of the interim bodies. However, this is precisely the dramatic and unnecessary action which the de facto officer doctrine is designed to prevent. As the court in *Barrett v. Craven County Bd. of Educ.*, 70 F.R.D. 466, 483 (E.D.N.C.1976), stated in applying the de facto officer doctrine in a similar situation,

> The entire community has a substantial interest in the stable and orderly administration of the schools. To retroactively invalidate the actions of the . . . Board of Education would have a disastrously disruptive effect on the administration of the . . . County School System and, therefore, on the education of . . . County students.

Because the de facto officer doctrine applies in the present situation, we reject plaintiffs' claims.

■ Plaintiffs also argue, by extension, that Public Act 87–454 further "perpetuated the unconstitutional discrimination" of the original School Reform Act by "establishing a bizarre scheme requiring LSC elections to

---

**11.** Given the number of schools in the Chicago Public School system, this legislation required the Mayor to make over 5,500 appointments.

be controlled and run by LSC members who may be running for election." In support, plaintiffs point to the provisions of Public Act 87–454 which direct the local school councils to publicize the date and place of the elections, as well as the names of the persons nominated. In addition, they note that the councils are obliged to declare, certify, and publish the results of the elections. However, plaintiffs fail to cite any legal authority for their proposition that this system is "bizarre" and violative of constitutionally protected rights, likely because such authority does not exist. On the contrary, the practice complained of by plaintiffs exists at virtually every level of both state and federal government. Indeed, Article I, Section 4 of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Section 5 additionally states that "[e]ach House shall be the Judge of the Elections, Returns, and Qualifications of its own Members...." Plaintiffs' suggestion that the provisions of the School Reform Act which allow sitting local school councils to administer elections are unconstitutional is therefore untenable.[12] Accordingly, we deny plaintiffs' motion and grant defendants' mo-

tion for summary judgment on Counts XIII through XVIII.[13]

█ Finally, plaintiffs raise a number of claims under various provisions of the Illinois Constitution. Only a few of them merit even brief consideration.[14] Plaintiffs maintain that the School Reform Act fails to comply with the requirement in Article III, Section 4 of the Illinois Constitution which requires that the General Assembly ensure the integrity of the election process and facilitate voting by all qualified persons. However, the statute itself provides that: (1) the elections are to be conducted by the board in consultation with the local school council; (2) the local school councils are required to publicize the relevant information about the elections by posting notices at the attendance center and at public places within the boundaries of the attendance center, by distributing notices to pupils, and by any other means necessary to insure maximum involvement; (3) voting is by secret ballot; (4) voting areas are open from 6:00 a.m. to 7:00 p.m. on election day; (5) disputes about procedures or results are resolved by the subdistrict superintendent; and (6) the Board may promulgate any other rules and regulations necessary to insure fair elections. *See* 105 ILCS 5/34–2.1. It is therefore clear that the Act not only sets basic requirements for the elections, but also delegates much authority to the Board of Education for further ensuring the integrity

12. Plaintiffs argue that this "infirmity" was exacerbated because the first elections after the enactment of Public Act 87–454 were administered by the local school councils which had been appointed by the Mayor pursuant to Public Act 86–1477, which plaintiffs claim were unconstitutionally impaneled. As stated above, however, we conclude that the actions of the appointed councils are not subject to plaintiffs' current attack. In any event, absent some allegation of fraud, we are unwilling to conclude that the initial election of local school council members pursuant to Public Act 87–454 "perpetuated" any "unconstitutionality." *Cf. People ex rel. Engle v. Kerner,* 32 Ill.2d 212, 205 N.E.2d 33, 39–40 (1965) (allowing unconstitutionally districted legislature to redraw districts).

13. Plaintiffs also claim that Public Act 87–454 violates the substantive due process of the Fourteenth Amendment because it fails to guarantee a republican form of government. However, "[t]he clause guaranteeing to each state a repub-

lican form of government has been held not to be justiciable." *Risser v. Thompson,* 930 F.2d 549, 552 (7th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991). Indeed, this particular rule is "well entrenched." *Id.* Accordingly, defendants are entitled to summary judgment on this claim.

14. Plaintiffs' claims under Article III, Sections 1 and 3 are essentially variations of plaintiffs' equal protection arguments. Accordingly, for the reasons we offered above in rejecting plaintiffs' equal protection arguments, we conclude that defendants are entitled to summary judgment on Counts XX and XXI. To the extent that plaintiffs claim that the amended School Reform Act violates Article III, Section 1 of the Illinois Constitution because it allows all voters to cast only five votes when there are eight elected positions, we note that plaintiffs offer no authority for this position, and we are aware of none. Accordingly, we reject plaintiffs' argument in this regard as well.

of the elections, which the Board has done in passing regulations regarding the elections. Notably, plaintiffs have failed to even attempt a showing that these provisions have failed, or that the voting process is not fair or does not facilitate voting by all qualified persons. Without such a showing, however, we are not inclined to even consider plaintiffs' claim based on Article III, Section 4. *Cf. Zbinden v. Bond County Community Unit Sch. Dist. No. 2,* 2 Ill.2d 232, 117 N.E.2d 765 (1954) (same constitutional provision not implicated absent specific showing of fraud).

■ Finally, plaintiffs argue that the General Assembly exceeded its authority under the Illinois Constitution when it provided for the election of local school councils without first designating them units of local government. Article VII, Section 8 of the Constitution provides:

> Townships, school districts, special districts and units, designated by law as units of local government, which exercise limited governmental powers or powers in respect to limited governmental subjects shall have only powers granted by law.... The General Assembly shall provide by law for the selection of officers of the foregoing units....

Plaintiffs read this section to state that the legislature may only provide for the selection of officers of a given body if it has first designated that body a "unit[ ] of local government." But this, of course, is not what it says. Instead, the section states that the legislature shall provide for the selection of officers for a body which *is* a unit of local government. In other words, it does not limit the authority of the legislature to provide for selection of officers of a given governmental body; rather, it limits (or, more accurately, eliminates) the authority of units of local government to provide for the selection of their own officers. Accordingly, this provision of the Illinois Constitution is not

implicated, and plaintiffs have failed to direct us to any other constitutional provision which might restrain the legislature from providing for the election of local school councils.[15] Defendants are therefore entitled to summary judgment on Count XXII.

**B. The Principals' Claims**

■ Plaintiffs raise several challenges to the General Assembly's decision to eliminate tenure for Chicago Public School Principals.[16] First and foremost, they claim it violates article I, section 10 of the United States Constitution and article I, section 16 of the constitution of Illinois, which prohibit government from passing legislation which retroactively impairs contractual obligations. Central to plaintiffs' claims is their assertion that the Act of 1917, which initially granted tenure to principals and teachers, created a contractual right to tenure. Because we disagree, we conclude that defendants are entitled to summary judgment on these claims.

Our consideration of this issue is guided by a series of United States Supreme Court opinions issued in the mid 1930s. In *Dodge v. Board of Education,* 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57 (1937), the Court considered an Illinois law which provided for the retirement of teachers and payment of annuities to retired teachers. The original version of the law ultimately provided for mandatory retirement at age 70, with an annual annuity of $1,500 in addition to any other retirement benefits the teacher was entitled to. The act was later amended to allow certain teachers to retire at age 65, and collect an annual annuity of $1,000 to $1,500, depending upon the teacher's age at retirement. Some years later, however, the legislature amended the law to set compulsory retirement at age 65, and reduced the annuity to $500 per year. The Illinois Supreme Court concluded that the amendment acted retroactively, and therefore applied equally to persons who had

---

**15.** In any event, we are unconvinced by plaintiffs argument that local school council members are not officers of the school district. Assuming that they are, then the General Assembly is unquestionably entitled under Article VII, Section 8 of the Illinois Constitution to provide for their selection.

**16.** Plaintiffs also claim that the Act destroys the affected individuals' tenure as teachers, since principals who are not retained as principals are relegated to "teacher eligibility lists" with no guarantee of future employment, even though they had earned tenure as a teacher prior to becoming principals.

already retired and persons who subsequently retired. *Id.* at 76–77, 58 S.Ct. at 99–100.

Plaintiffs, who had either retired or were eligible for voluntary retirement prior to the amendment of the law, challenged the amendment, claiming that their rights to annuities were vested rights and that the law established a contract between them and the state. The Illinois Supreme Court disagreed, and the United States Supreme Court affirmed. The Court initially noted:

In determining whether a law tenders a contract to a citizen, it is of first importance to examine the language of the statute. If it provides for the execution of a written contract on behalf of the state, the case for an obligation binding upon the state is clear. Equally clear is the case where a statute confirms a settlement of disputed rights and defines its terms. On the other hand, an act merely fixing salaries of officers creates no contract in their favor, and the compensation named may be altered at the will of the Legislature. This is true also of an act fixing the term or tenure of a public officer or an employe of a state agency.

*Id.* at 78–79, 58 S.Ct. at 100 (footnotes omitted). Relying upon the rationale advanced by the Illinois Supreme Court, the Court concluded that neither the language of the statute nor the circumstances of its adoption demonstrated an intent to create a contractual obligation. Instead, it merely set the level of the retirement annuity for teachers, and was essentially a gratuity, involving no agreement of the parties.[17] *Id.* at 79–80, 58 S.Ct. at 100–01. Accordingly, the Court found that no contract existed, and the legislature could therefore amend the statute at will.

Similarly, in *Phelps v. Board of Education,* 300 U.S. 319, 57 S.Ct. 483, 81 L.Ed. 674 (1937), the Court concluded that a law which established tenure and prohibited salary reduction for teachers and principals did not create contractual rights, and the state legis-

lature was therefore free to subsequently amend or eliminate those provisions. The Court approvingly quoted a portion of the state court's opinion:

[The law] established a legislative status for teachers, but we fail to see that it established a contractual one that the Legislature may not modify.... The status of tenure teachers, while in one sense perhaps contractual, is in essence dependent on a statute, like that of the incumbent of a statutory office, which the Legislature at will may abolish, or whose emoluments it may change.

*Id.* at 322, 57 S.Ct. at 484. The court additionally noted that the employee "assumed no binding obligation to remain in service" and the prohibition against salary reduction and discharge "was but a regulation of the conduct of the board and not a term of a continuing contract of indefinite duration...." *Id.* at 323, 57 S.Ct. at 485.

Finally, in *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938), the Supreme Court did find that a contract was created by the Indiana Teachers' Tenure Act. That statute provided that, following a five year probationary period, a teacher who entered into a contract with a school board was entitled to permanent employment. The statute further provided that "[u]pon the expiration of any contract between such school corporation and a permanent teacher, such contract shall be deemed to continue in effect for an indefinite period and shall be known as an indefinite contract." Ind.Code Ann. § 6967.1 et seq. (Burns Supp. 1929). In concluding that the statute established a contract, the Court focused on essentially two factors. First and foremost, it noted that the statute itself used the term "contract" twenty-five times in the relevant portions, and spoke "of the making and canceling of indefinite contracts." *Brand,* 303 U.S. at 105, 58 S.Ct. at 448. In addition, the Court relied upon the fact that, prior to the

---

17. The plaintiffs maintained that "they, as teachers, especially those who voluntarily retired when otherwise they would not have been required so to do, rightly understood the state was pledging its faith that it would not recede from the offer held out to them by the statute as an

inducement to become teachers and to retire." *Id.* at 80, 58 S.Ct. at 101. The Court rejected this argument, noting that prior to the adoption of the statute, Illinois courts had consistently held that such benefits systems did not create contracts or vested rights. *Id.*

case before it, the Indiana Supreme Court had routinely held that the rights created by the Act were contractual in nature. Based upon these factors, the Court concluded that the statute created contractual rights, and, as a result, the state could not simply take them away. *Id.*

Plaintiffs in the present action would have us reach the same conclusion as the *Brand* court. We initially observe that plaintiffs have a very heavy burden. First, defendants are entitled to a presumption that the law "is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise." *Dodge,* 302 U.S. at 79, 58 S.Ct. at 100 (footnote omitted). *See also National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 466, 105 S.Ct. 1441, 1451–52, 84 L.Ed.2d 432 (1985) (same). Furthermore, "where a statute is claimed to create a contractual right we give weight to the construction of the statute by the courts of the state. . . . Unless these views are palpably erroneous we should accept them." *Phelps,* 300 U.S. at 322–23, 57 S.Ct. at 485 (footnote omitted).

In *Fumarolo,* the Illinois Supreme Court determined that teachers and principals did not have a contractual right to continued employment, and therefore concluded that the School Reform Act did not violate the "impairment of contract" provisions of either the United States or Illinois Constitutions. At first glance, this holding would seem to be dispositive of plaintiffs' state law claim, and highly persuasive with respect to plaintiffs' federal law claim. *See Phelps,* 300 U.S. at 322–23, 57 S.Ct. at 484–85. Plaintiffs, however, have disputed the relevancy of the *Fumarolo* court's pronouncements in this area, and, indeed, assert that that court's conclusions should be ignored in the present action. We shall therefore first consider plaintiffs' challenge to the precedential value of *Fumarolo.*

As discussed above, the Illinois Supreme Court concluded that the School Reform Act was unconstitutional based upon the provisions for the election of the local school councils. Accordingly, the Court determined that it was "not formally necessary to consider" the tenure claims. *Fumarolo,* 153 Ill.Dec. at 198, 566 N.E.2d at 1304. It nonetheless acknowledged that "these issues may arise again should the legislature choose to reenact the legislation in a different form," and therefore chose to examine the tenure claims. *Id.* Plaintiffs assert that, by the Court's own admission, the analysis of these issues in *Fumarolo* is at most mere dicta, and thus not entitled to deference. However, it is well established that "[c]onsidered dicta of a state supreme court must be given weight by a federal court in ascertaining state law. . . ." *In re Air Crash Disaster Near Chicago,* 701 F.2d 1189, 1196 (7th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983); *see also Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1023 (5th Cir.1982) ("[C]onsidered dictum is to be followed as well as a precise holding."), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983). Defendants maintain that the *Fumarolo* court's analysis clearly qualifies as considered dicta. Indeed, the court engaged in a lengthy discussion of the issues, analyzed relevant case law, and effectively responded to the arguments made by the plaintiffs in that action. In response, however, plaintiffs offer several reasons why the Court's conclusions are not entitled to the deference afforded "considered dicta." First and foremost, plaintiffs argue that the *Fumarolo* court did not have in front of it the history leading upon the 1917 law which first provided for permanent employment of teachers and principals. Because the circumstances surrounding the enactment of a statute are essential in determining whether the statute creates contractual rights, plaintiffs maintain, the *Fumarolo* court's analysis was necessarily lacking.

We first observe that, while the history surrounding the passage of legislation alleged to create contractual rights is no doubt of assistance in understanding the statute, "it is of first importance to establish the language of the statute." *Dodge,* 302 U.S. at 78, 58 S.Ct. at 100. *See also Brand,* 303 U.S. at 104, 58 S.Ct. at 447–48 ("Where the claim is that the state's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract.")

Accordingly, the *Fumarolo* court's focus on the language of the statute was not only not erroneous, it was entirely proper. In any event, having reviewed the history of tenure for principals and teachers, we resolve that it would not have changed the conclusion reached by the Illinois Supreme Court. The Rules and Regulations of the Board of Education of Chicago prior to the enactment of the 1917 law do indeed provide for permanent employment of teachers and principals following a given probationary period. However, like the law itself, these Rules nowhere mention that they are creating contractual rights, nor do they even mention the word contract. In enacting legislation following the Illinois Supreme Court's decision in *Fursman*, the legislature was presumably merely "declar[ing] a policy to be pursued," *i.e.*, a continuation of the permanent employment that teachers and principals enjoyed prior to *Fursman*. Neither that policy nor the Rules of the Board, however, indicate an intent to create a contractual right which would forever prevent the Illinois General Assembly from pursuing another policy. Because the language of the statute itself is of primary importance, and because the history leading up to the statute's passage provides little additional insight, we conclude that the *Fumarolo* court's resolution of the tenure issues constitutes "considered dicta," and we shall therefore treat it as dispositive with regard to the state law claim.[18] Accordingly, defendants are entitled to summary judgment on Count III of plaintiffs' complaint.

In addition, the *Fumarolo* court's analysis of plaintiffs' federal claims is to be considered highly persuasive. This is particularly true in the context of the Contracts Clause of the United States Constitution, since, as noted above, "where a statute is claimed to create a contractual right we give weight to the construction of the statute by the courts of the state.... Unless these views are palpably erroneous we should accept them." *Phelps*, 300 U.S. at 322–23, 57 S.Ct. at 484–85 (footnote omitted). In the present action, we cannot conclude that the views expressed in *Fumarolo* are "palpably erroneous." We shall presume that statutes such as the one at issue here are merely declarative of legislative policy, rather than intended to create contractual or vested rights. *Dodge*, 302 U.S. at 79, 58 S.Ct. at 100–01 (footnote omitted). And, as discussed above, we see nothing in the language or history of the 1917 statute to defeat that presumption. Unlike the statute involved in *Brand*, the 1917 act never mentions the word "contract," nor does it provide any other indication that the legislature intended to create contractual rights. Furthermore, the *Fumarolo* court found that, with one exception of arguable value, Illinois courts have consistently "concluded that legislative acts fixing the terms or tenure of employment of employment of public employees do not create private contractual rights." *Fumarolo*, 153 Ill.Dec. at 199, 566 N.E.2d at 1305. Thus, the other factor which convinced the *Brand* court that a contract existed, *i.e.*, consistent state court interpretation of the statute as creating contractual rights, is not only absent here, it is directly refuted. Accordingly, we agree with the Illinois Supreme Court that the 1917 act did not vest plaintiffs

18. Plaintiffs' other objections to the *Fumarolo* court's analysis are likewise unavailing. They initially maintain that the Court "failed to apply well-established Illinois case law to the contract claim under the Illinois Constitution." In support, plaintiffs claim that the Illinois Constitution prohibits retroactive impairment of *any* vested rights, not just vested contractual rights. Whether this is true is irrelevant, since the *Fumarolo* court expressly concluded that the plaintiffs in that action had no vested rights through enactment of the statute. What the Court did conclude was that the plaintiffs had a "property interest" in continued employment. However, as the *Fumarolo* court concluded, a property interest is a far cry from a vested right to continued employment, and in any event, does not implicate the "impairment of contracts" provision in the Illinois Constitution. *See Fumarolo*, 153 Ill.Dec. at 200, 566 N.E.2d at 1306. Similarly unavailing is plaintiffs' argument that the Court failed to consider a "justice, fairness and equity" exception to retroactive application of a statute. First, the cases relied upon by plaintiff are Illinois Appellate Court cases, rather than Supreme Court precedent. Furthermore, in another part of its opinion, the Court concluded that "enactment of the statute was not arbitrary or irrational," and involved the participation of all interested parties. *Id.*, 153 Ill.Dec. at 201, 566 N.E.2d at 1307. Accordingly, the "justice, fairness and equity" exception, even if eventually adopted by the Illinois Supreme Court, was not implicated by the School Reform Act.

with contractual rights, and conclude that the School Reform Act does not violate the Contracts Clause of the United States Constitution.[19] Defendants are therefore entitled to summary judgment on Counts I and II.[20]

Plaintiffs next argue that the United States and Illinois Constitutions are violated because principals whose contracts are not renewed are also deprived of the tenure they earned as teachers.[21] That is, such individuals are placed at the end of "teacher eligibility lists," with no guarantee of future employment. Tenured teachers who are not retained for reasons unrelated to cause, on the other hand, are titled "supernumerary" teachers and are guaranteed employment and full salary and benefits. Plaintiffs maintain that this system violates both the substantive due process clause of the United States and Illinois Constitutions and the prohibition against bills of attainder in Article I, section 10 of the United States Constitution. We disagree.

These arguments are essentially minor variants upon the claim in *Fumarolo* that this system violated equal protection. Under that rubric, plaintiffs' claim failed because the court concluded that there existed a rational basis for distinguishing between principals' "teacher tenure" and teachers' tenure. *See Fumarolo,* 153 Ill.Dec. at 202, 566 N.E.2d at 1308. As plaintiffs in the present action implicitly recognize, both of its present variations on the equal protection theme, *i.e.,* substantive due process and bill of attainder, can similarly be overcome by a showing of rationality. *See, e.g., Nixon v. Administrator of Gen. Serv.,* 433 U.S. 425, 476, 97 S.Ct. 2777, 2807, 53 L.Ed.2d 867 (1977) (consider-

ation of whether law furthers "legitimate legislative purposes"); *Pence v. Rosenquist,* 573 F.2d 395, 398 (7th Cir.1978) (relevant test is "whether the challenger can demonstrate that there is no rational connection between the policy and accomplishment of a public purpose"). The *Fumarolo* court relied upon the following factors in finding a rational basis for treating teachers differently than principals:

> Teachers who are performing satisfactorily but who lose their positions for nonperformance reasons could reasonably be given preferential consideration over administrators whose contracts were not renewed because of failure to meet performance standards and who wish to return to teaching. Also teachers are likely to be more familiar with current materials, curriculum and teaching practice because they have the most recent experience in the classroom. Also, the administrative nature of the principals' and subdistrict superintendents' positions may justify the differing provisions. A stated goal of the Act was to increase community control over the administration of the public school system. Guaranteeing an administrator's status might, therefore, be judged inconsistent with the goals the Act was attempting to achieve.

*Fumarolo,* 153 Ill.Dec. at 202, 566 N.E.2d at 1308. We are likewise convinced that there exists a rational relation between the goals of the Illinois General Assembly and the provisions of the School Reform Act which refutes any constitutional claim plaintiffs might allege. Defendants are therefore entitled to summary judgment on Counts VI–VIII.

---

**19.** Plaintiffs also argue that the legislature's failure to use limiting language (*e.g.,* reserving the right to repeal or amend the statute) is indicative of its intent to be contractually bound. However, even the case which plaintiff cites for this proposition only relies upon the *inclusion* of such language as an afterthought confirming its conclusion that no contract existed. In short, while the use or exclusion of limiting language may assist the court in determining whether a contract exists, it is by no means dispositive of the issue.

**20.** For the same reasons, plaintiffs' promissory estoppel claim must fail. That is, an individual cannot reasonably rely on continued employment

absent some vested right thereto. *See Smith v. United States,* 723 F.Supp. 1300, 1309 (C.D.Ill. 1989) ("A property interest is created by state law; therefore it can also be removed by state law. While the state is not free to confer a property interest such as tenure on a public employee, and then arbitrarily discharge that employee in violation of that interest, a state is free to abolish the entire interest.") *See also Dodge,* 302 U.S. at 80, 58 S.Ct. at 101 (finding against plaintiffs notwithstanding their claim that they relied upon statutory "representations" to their detriment).

**21.** An individual must earn tenure as a teacher prior to becoming eligible to be a principal.

Plaintiffs finally assert that they have been deprived of their property without just compensation, in violation of the takings clauses of the United States and Illinois Constitutions. They base this argument on the *Fumarolo* court's conclusion that they possessed a "property interest" in continued employment. Contending that all property rights are equally protected by the takings clause, plaintiffs maintain that they have stated a viable claim. We disagree. In *Kizas v. Webster*, 707 F.2d 524 (D.C.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984), the Court of Appeals for the District of Columbia Circuit rejected the very claim plaintiffs are making. It acknowledged that, for the purposes of the *due process clause*, a legitimate claim of entitlement to a benefit may constitute a property interest.[22] It then squarely rejected the claim that that same property interest implicated the takings clause:

> This presupposition is without foundation. As a leading commentator has admonished, "[t]he fifth amendment employs two independent clauses to address two independent issues. A claim of *deprivation* of property without due process cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation." A "legitimate claim of entitlement" to a government benefit does not transform the benefit *itself* into a vested right. Rather, due process "property interests" in public benefits are "limited, as a general rule, by the governmental power to remove, through prescribed procedures, the *underlying source of those benefits*."

*Id.*, 707 F.2d at 539 (emphasis in original) (footnotes and citations omitted). In short, absent a finding that plaintiffs have some vested right, a contention which both this court and the *Fumarolo* court have rejected, plaintiffs are unable to state a claim under the takings clause.[23] Accordingly, defendants are entitled to summary judgment on Counts IX–XII.

### III. Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted. It is so ordered.

---

22. This, of course, is consistent with the conclusion reached by the court in *Fumarolo* that plaintiffs had a property interest in their employment.

23. Throughout their papers, plaintiffs maintain that the *Fumarolo* court concluded that they have a vested property right to continued employment. The *Fumarolo* court reached no such conclusion. On the contrary, it found no indication that the legislature "intended to create vested contractual rights through enactment of the statute." *Fumarolo*, 153 Ill.Dec. at 200, 566 N.E.2d at 1306. Likewise, the trial court found that plaintiffs had no vested right to continued employment. And although the Supreme Court concluded that plaintiffs had a *property interest* in their employment which in turn entitled them to due process prior to elimination of tenure, the court notably did *not* refer to this interest as either "vested" or a "right." Plaintiffs' misconstruing of the *Fumarolo* court's words notwithstanding, it is clear that that court never held that plaintiffs had a vested right to tenure.